Please be seated. Call the next case, please. 3-13-0111 SEMB's, Inc. v. Gaming & Entertainment Management-Illinois, LLC Please be seated. Counsel, and before we start the timer here, we're going to advise you, we just received a day or so ago, a defendant appellee's notice of supplemental authority. Most of that's denied. So, that takes care of that. All right? Thank you, Your Honor. Good morning. May it please the Court, Counsel. My name is Lane Ulster. I represent the plaintiff appellant, SEMB's, Inc., doing business as Dali's. Before I go any further, I want the Court to be aware that I know that the Court's heard almost the exact same fact pattern that we're here on today in the case 777 v. Jim. Many of the same arguments that were heard by this Court in that case are briefed in this case. And for that reason, I'm going to just focus in on one particular argument. If the Court has questions about anything else that's been briefed, obviously, I'd happily answer that. Your argument. Do it however you want. Thank you, Your Honor. We're here today to talk about a contract for gambling. Now, the Illinois Criminal Code specifically states that a person commits gambling when he or she knowingly operates, keeps, owns, uses, purchases, exhibits, rents, sells, bargains for the sale or release of any gambling device. Now, I don't think there can be any dispute that this is a contract for gambling because it obviously meets the definition of a gambling device. Gambling in Illinois is illegal. Therefore, any contract made in furtherance of gambling is null and void. Tom's redemption case was cited for that proposition. There's really no defense to that proposition. A contract for gambling is null and void. The only way that it is not illegal in Illinois to contract for gambling is if an Illinois statute specifically authorizes such gambling. Here, the only act that possibly authorizes the lease of a video gaming terminal, which the contract issue deals with in an establishment, is the Illinois Video Gaming Act and any regulations that have been implemented through that act. However, the defendant's appellee, Jim, has argued that the Illinois Video Gaming Act and its supporting regulations don't apply to this contract. If that's the case, then there's nothing that pulls this contract out of the realm of a contract for gambling that is illegal under the Illinois criminal code. And as I've stated before, the Tom's redemption case stands for the proposition that a contract for gambling is void of an issue. Therefore, this contract issue in this case that is for gambling, for placement of use for lease and sale of video gaming terminals in an establishment, is illegal and is void ad omniscio back when it was formed. Now, just a brief refreshment of the facts. This contract, the Metro Placement Agreement, as we've defined it in the brief, was entered into between my client, Dali's, and a company called Metro Amusements, LLC, back in June of 2010. At that time, my client was not a licensed establishment, and Metro did not have a license to operate as a terminal operator, pursuant to the Illinois Video Gaming Act. Metro, in fact, never sought licensure as a terminal operator. Isn't Dali and Privity with parties in the 777 case? Dali, after the fact, entered into a contract with 777. That is correct. Presently, that contract, that was the subject of the 777 v. Jim case. So wouldn't there be collateral estoppel impact based on the 777 case? Your Honor, we'd argue that the collateral estoppel does not apply to this case because, if the Court recalls, the 777 decision in the circuit court was actually a decision based on ripeness. The court in that case said that 777 did not have the ability to bring a claim against Jim at that time because the establishment, Dali's, was not yet licensed. And at that point in time, I believe both of the terminal operators were in fact licensed, but the contract couldn't be put into act because obviously there was not a licensed establishment. So the court said this matter is not right. And that obviously is an issue of subject matter jurisdiction. Well, both cases tried to invalidate the Metro agreement, right? That is accurate. The same Metro agreement. That is correct, Your Honor. But in the 777 order of dismissal, the reason that the court dismissed that matter was because the matter was not yet right. The court did go on to state in dicta that there was a number of other reasons why it would have potentially determined that the contract was valid and enforceable, the Metro placement agreement, which is that issue here. However, the reason that that court dismissed the complaint was because the matter wasn't right. That's an issue of subject matter jurisdiction. And the law in Illinois is very clear that when you have a dismissal of matter on grounds of lack of subject matter jurisdiction, that is not collateral estoppel. It's not an issue of ratio decada. When a case comes up on the merits, we would argue that there's no collateral estoppel or ratio decada effect in this case. Going back to the brief review of the facts, we had two unlicensed entities that signed this contract for gambling. It was clearly a contract for gambling. Like I said before, it was for the lease or inter-sale of video gaming terminals. There's no second contract that's been entered. Jim, the defendant, argues that this is some kind of precursor agreement. Well, we've already discussed this at length, and there is no discussion of precursor agreements in the Illinois Video Gaming Act. That precursor agreement is a contract for gambling. It is the same contract they're now arguing allows them to force Dalis to put their gaming terminals in their establishment. Clearly, at the time, it was a contract for gambling, no licensed entities. Therefore, there's no act that regulated it or authorized it. It was an illegal contract for gambling in violation of the criminal code. The contract was then, shortly thereafter, within about two months, assigned by Metro to an entity known as Best Gaming LLC. Best Gaming is an unlicensed terminal operator. Best sought licensure, but its application for licensure was denied by the Illinois Gaming Board in June of 2012. Shortly thereafter, on July 16, 2012, Best then assigned this contract to the defendant, Jim, who was, at that time, a licensed terminal operator. Prior to Dalis seeking licensure, or I'm sorry, Dalis actually obtaining licensure as an establishment, Jim sought to enforce the agreement to place these terminal operators in Dalis' establishment. So we have a situation where we have a contract that the defendant says is not under the purview of the Illinois Video Gaming Act and is not subject to its regulations or the act, and they're trying to enforce it. They're trying to enforce a contract for gambling. Once again, contracts for gambling in Illinois are invalid. They're void, ab initio, and for that reason, we believe that this court should reverse the rule or the order of the circuit court in this case. You know, I've got a couple of preliminary questions. You're arguing that the counts 1 through 4 are up on appeal. Is that right? Correct. But your opponent says only count 1 is up on appeal. We've only addressed count 1. I think the preliminary injunction count as well as the other two counts other than count 1 have not been addressed in the appeal, so therefore we're really appealing only count 1. And with regard to your statement about you make a statement in your brief that Judge Lannon's determination in the other case was clearly dicta, the other determinations. I believe that Judge Lannon in his order, and that was in the 777 matter, ruled that he was dismissing the case for lack of rightness. But then he went on. But he went on to discuss other matters. Obviously, when a case is dismissed for lack of rightness, as the subject matter jurisdiction case or issue, the court was effectively saying we don't have subject matter jurisdiction to adhere to this matter. So anything else that was stated for purposes of collateral estoppel and ratio decada cannot be affected. Likewise, in the 777 case, they said the contract was okay. That is accurate. In fact, Your Honor, I believe that that matter is presently pending for the petition for leave to appeal to the Supreme Court. By the way, I don't think the Supreme Court has made any determination on that. We respect, obviously, this Court's decision in that case, but believe that this particular issue regarding the gambling, the illegality of a gambling contract, wasn't really addressed in the 777 matter, at least to the point where the Court could understand these agreements, these precursor agreements aren't actually discussed in any portion of the Illinois Video Gaming Act, and that this idea of a precursor agreement really is just a legal contract for gambling that falls within the scope of the Illinois Video Gaming Act. That's handled by the agency. In fact, as part of the affidavit, I mean, the things they file with the agency as some of these agreements and so forth are listed. Can you please repeat that, Your Honor? When you file seeking permission to do things, you tell them about some of these other agreements. I believe you're referring to the application that the defendant, Jim, has brought up. Obviously, an application has no authority over the language of a statute as well as the language of the regulations. It's not law. It's just an application. Who knows who created that application? I'm not sure, but it shouldn't be persuasive to this Court and clearly isn't binding on this Court. So you don't want us to use the 777 case? I believe the Court can obviously look at its decision in 777, and obviously the number of the same arguments were made in 777, but we believe that on the face of this one argument alone. I mean, arguably it's the same people. I apologize? In a way, it's the same people. The individuals involved, the parties in privity of contract to the Metro Placement Agreement are the same parties that were involved in the Metro Placement Agreement in the 777. The only difference is that the establishment, Dutleys, as the plaintiff in this case in 777, is a party that contracted to a later date with Dutleys. And in 777, this Court said that the contract was not a use agreement under the Act, right? That is correct. And then in later paragraphs, they applied the Act to it. I tend to agree, Your Honor. Okay. We would argue, obviously, that the Act, if Jim's position is that the Act doesn't apply, the only thing that could apply is the fact that there's a contract for gambling that would have fallen into the criminal record. That's an illegal and void ab initio. Thank you, Your Honor. Good morning, Your Honor. Doug Ramsey on behalf of Gaming and Entertainment Management. I'll refer to them as GEM. May it please the Court, I will respectfully say that I think not only are the same parties effectively before this Court, but so too are the same facts, the same allegations, the same arguments, as this Court has already considered in the 777 case. Certainly, Let me ask you a question. If the contract is not a use agreement under the Act, and that's what the Court said, then what possible relevance would the Act have to that agreement? Well, and here's the important question, and it's one that actually 777 addresses, the decision addresses, which is at the time at its formation, and at the time of the various assignments from Metro to BEST and then from BEST to GEM, it is not a use agreement because it's not an agreement between licensed parties at any point at any of those activities. However, and this is what 777 says, and it's consistent with our position, is that at such time as it elevates to a use agreement, in other words, at such time as the parties to the agreement become licensed under the Video Gaming Act, then it is subject to and may be enforceable and valid under the Act. And that's an important piece because it acknowledges, Well, let me ask, okay. Gambling has been regulated or prohibited in this country because, in this state, we'll just talk about this, because of all the nefarious conduct that goes along with it, right? I mean, generally, remember when we were in law school, we learned about Malum Prohibitum and Malum Per Se, and gambling was one of those Malum Per Ses. And it also used to be that the reason they outlawed this stuff was because people used to come around to saloons or places with Louisville sluggers and gaming machines, and they said, Which, you know, do you want our machine in your saloon or do you want your kneecaps? And so now that they decided they could get some revenue out of it, they're going to strictly regulate this. Well, does it, allowing people to go out before the Act takes effect and when they're unlicensed people going out and entering into contracts with people when they're not licensed because they don't want to. Doesn't that defeat the whole purpose of the Act? Absolutely not, and let me tell you why. So the Illinois Gaming Board, pursuant to the Video Gaming Act, is authorized, and it's not a broad authorization. Its authority is to regulate video gaming operations and activity. Video gaming operations and activity can only take place, in this context, pursuant to a valid lease agreement, and the video gaming terminals can only be installed by licensed terminal operators and licensed established pursuant to that agreement. None of the facts here change. But here you've got people entering contracts that not only aren't licensed but never did get licensed because they were rejected and then they transfer and transfer and transfer. So you're letting people who can't get licensed because even the state of Illinois won't approve them, and yet say the contracts they entered into were valid gaming contracts that they could sell to somebody else. Does that make sense to you? It does, and here's why. So clearly this was an Act that was passed in 2009 but didn't actually begin until, there are no video game operations until October of 2012. And so you do have this initial three-plus-year startup period during which I think the Illinois Gaming Board wanted to, and in fact did incentivize various parties to engage in a number of different startup activities, including entering into these pre-licensure agreements. Where's that? Well, I'll tell you where. It's pursuant to the Illinois Gaming Board's very practice and policy. I mean, they were, in their licensing applications, they're asking for prospective operators and licensees to submit their contracts as part of the application process prior to their licensure. So that they know that this is occurring, they're encouraging it to occur because it's part of this process, because you ultimately want to encourage the efficient and effective implementation of video gaming. You want to do that not only for the industry, but really I think what their primary concern is, is that, look, this is a revenue-generating device for the state. And if we can expedite this process and make it occur sooner than otherwise, you're going to get tax revenue that's going for the state. Remember, this is a tax revenue bill. That's why it was passed in 2009, is in order to generate revenue for the state. So we'll forget the safeguards to expedite. Well, but you're not, because these parties are allowed to contract before they are licensed, that doesn't mean that any of these parties can install or operate any video gaming terminals, or that they can derive revenue from any video gaming terminals prior to them obtaining a license. Now, in our case, Metro and Vest, they made their assignments at periods of time when, and Metro made it before it applied for an application. Vest did as its application remained pending and from the Illinois Gaming Board. It was then assigned to gaming and entertainment management before its denial of its request. And I'll say the council misstates the record. They say that in June of 2012, the Illinois Gaming Board denied their request. That's not actually a true state of facts, and it's not a true application of the rules and regulations. What the rules and regulations clearly provide is that an applicant remains an applicant even after they receive an initial notice of denial, so long as they make a request for a hearing, which in this case is exactly what Vest did. So Vest made a request for a hearing. The initial notice was not effective and didn't become effective... Does the statute say an applicant can contract? The statute says that. It doesn't comment with respect to that, and that's why one of the things you cannot... Who does the contract say, who does the statute say can contract? It doesn't provide that. What it provides for is that video gaming terminals can be installed by licensed entities pursuant to a use agreement. It does not in any way limit... And this is exactly what 777 holds. It does not in any way limit or prohibit parties from entering into these contracts before they are licensed. Now, what it does prohibit is the installation and operation of those video gaming terminals until folks are licensed. But if all of a sudden you're going to read into a restriction or a limitation into the act that doesn't exist, that's beyond the statutory powers or the authority that this court has. Because you'll be reading in a limitation that just wasn't there. And not only is it not there, it would upset a practice of the Illinois Gaming Board that has existed since 2009. Remember, the Illinois Gaming Board is accepting these applications with these pre-licensure agreements as part of its regular practice. And to change the rules four years after the fact would dramatically impact what is going on in the industry. There are literally thousands of contracts that were assigned... And incidentally, Judge, the contract that 777 signed with DeLees was also a pre-licensure agreement. Because at the time that 777 signed its contract with DeLees, DeLees was not a licensed entity pursuant to the Video Gaming Act. And so you can't read it... You can't, out of one side of your mouth, argue that it can only be entered into by licensed parties. And then when you're arguing about me, or when you're arguing about yourself, saying that my contract is perfectly acceptable despite the fact that one of the parties to the contract was an unlicensed entity, it doesn't make sense. Well, I don't think they're arguing that the contract ought to apply to them. Well, let's talk about it this way. And let's just be matter-of-fact that 777 entered into a contract with DeLees. At the time that contract was entered into, 777 was licensed. DeLees was not. 777 is now operating video gaming terminals at DeLees' establishment pursuant to that contract. So if you're going to, all of a sudden, interpret our contract as not being valid, you would equally have to make that same analysis with respect to the 777 and DeLees contract. But we would argue that you can't, and you shouldn't do that, because you're going to upset the way the Illinois Gaming Board has looked at this, the way that the industry has practiced in this way, and you put at risk thousands of contracts that have been entered into pre-licensure and assigned by various parties. But at the end of the day, so what? I mean, you can do new contracts tomorrow. Well, I'll tell you so what, which is, this is a hyper-aggressive industry. And what are you going to do? Because their hyper-aggressivity in the back has led to people getting hurt. Practically speaking, on the street, how this would affect, if all of a sudden you upset these pre-licensure agreements, there are thousands of locations which are already operating pursuant to what was originally a pre-licensure agreement. But then after the parties became licensed, then became a use agreement. You're then putting at risk the operations of those various establishments, because what you're saying is that that underlying contract never existed. And you can't do that without creating seismic problems within this industry. And I'm not overstating those. This is literally the way the industry has operated. How many of those disposed original contracts were entered into by operators that were later denied licensure? I have a general sense of what that is, but that's not part of the record. There are literally hundreds of those, if not thousands of those, and many of which are in operation today. I mean, certainly, again, not in the record, but gaming and entertainment management strategy was to come into this market and to buy up contracts. And so the way that it has really built its portfolio is through this very practice that we have now. And it's spent considerable resources in doing that. And isn't all this process all set forth not in the statute, but through administrative rule, and they set out these policies and some of these deadlines and other things that wouldn't appear in the statute, but that is the practice and the application process all as a function of the gaming board or perhaps through JCOB or something as an administrative function? It is, and I would even take it a step further, which is that it's sort of administrative policy or is a reflection of really dealing with gaming board's practice and policy. And for this court to then substitute its judgment for that practice, and certainly the way this industry has been conducted for the last four years, could have serious consequences that are beyond just this court, beyond just this case. But the law has given this agency or this gaming board the operational mandate to set up these application guidelines and so forth and so on. It does. The authority of the gaming board is sort of two-fold. One is just to regulate gaming activity, and that's very important because in our context, they don't have the authority to regulate startup activity or pre-licensure activity. Now they may take that activity into consideration when making a determination about licensure, but that's very different than saying that they regulate these applications. So is our standard of review limited to if the gaming board allows it, next case, we don't need to butt in? No, I wouldn't say that, Judge. What I would say is that the Illinois Gaming Board, which is charged with regulating this industry and charged with licensing the various entities within this industry, certainly have policies and practices that this court should respect and give deference to. Does that mean that those things certainly trump other considerations? I don't believe that that's true, and I don't want to overstate my argument, but what I can say is that... Do you think the gaming board was really thinking that these contracts were going to be entered in about the situation where contracts are originated by people who could never get licensed because they're not nice people, and that they were going to So let's think about it really from the applicant's perspective, which is the applicant comes into the market, the Illinois Gaming Board is encouraging them to sign up these pre-licensure agreements. They do so. They collect them, and they spend their resources in doing so, their time in doing so. Those contracts are assets of these companies, of these corporations, and then they get an initial notice of denial from the Illinois Gaming Board. And I think what they will likely do, and the Illinois Gaming Board certainly anticipated that people would make applications and that those applications would be denied, and I think it would be inconsistent to say that the Illinois Gaming Board would not allow these folks to then benefit from those initial start-up activities. Under your approach, what is the stop when this thing is done, somebody who wants to come in later and get licensed, who's sending a team of guys out with Louisville sluggers to get contracts, get me all the contracts you can. You'll never get licensed, but I'll buy them from you. We can buy them from you. What's the stop there? Yeah, and certainly that's not our facts, but I'll address it, which is in order to be a valid binding use agreement, it has to comply with certain minimum standards. And I don't know if the Louisville slugger is sort of maybe a little bit dated. I think a more apt sort of scrupulous operator or perspective operator who goes out and wants to incentivize different locations by paying them money or giving them TVs or giving them something in exchange for signing a use agreement or signing a pre-licensure agreement. You absolutely can't do that. There is a rule in Rule 320 which says that there can be absolutely no inducements with respect to the contract that you can't give anything in exchange for an establishment to enter into that contract with you. And it has to be not only in the contract, it has to be true as a matter of fact. I would like to address, 777 really does answer all of our questions. It raises all of the issues that this Court has presented with. The only argument that has been raised to undercut it is that the IGB made some changes to its frequently asked questions section. That was part of a massive overhaul. And we have statements in the record saying that those changes were in no way responsive to 777 or any pending litigation. And therefore, you can't make the stretch that the Illinois Gaming Board was somehow changing its rules and policies by making these changes. In fact, they don't support what DeLees holds them out for. And interestingly, the one argument that DeLees offers today as its primary lead argument is that this underlying contract is an illegal contract for gaming. That issue was raised in 777 for the very first time, but it was raised in the reply brief of 777. It was not raised in this Court at all, in this case at all. It was not part of the complaint. It was not part of the trial record. It's an argument that is first advanced here. It has clearly been waived or forfeited by DeLees. But more importantly, it's just dead wrong. The video gaming operations that are conducted in accordance with the Act, if video gaming operations were to be conducted pursuant to the exclusive placement agreement, they would be precisely in accordance with the Act. The exclusive placement agreement says specifically that the contract and the parties will comply with the video gaming laws, the Video Gaming Act, the video gaming rules and regulations. They will obtain their licenses pursuant to the Video Gaming Act, that they will only be able to install those video gaming terminals after they obtain their licenses from the Illinois Gaming Board. Let me just ask you before you go, what you just said. 777 said you're talking about this and what you are discussing. 777 said the plain language indicates that a contract between the two parties here is not a use agreement under the Act unless it is between a licensed operator and a licensed establishment. Here, neither Metro nor Delis was licensed under the Act when it signed a placement agreement. Thus, the DALYS agreement is not a use agreement. Therefore, the rules and regulations prohibiting the assignment of use agreements do not apply to the agreement. So, you can do whatever you want. It's and I think it's a nuance, it's not really a nuance question at all. It's a reflection that these agreements, before they become use agreements and the use agreements have to have two licensed parties on either side of the contract, that those rules and regulations that apply to use agreements only apply to use agreements and you can't apply those rules and regulations to pre-licensure agreements. However, the rules and regulations What rules do apply to pre-licensure agreements? Basic contract negotiations and terms Well, gaming contracts are illegal. But these contracts specifically predicate gaming on obtaining your licenses from the Illinois Gaming Board and specifically say that you have to have those licenses before you can conduct any of that video gaming activity. That's precisely in line with the Video Gaming Act. It requires licensure on either side. It says that you can't engage in any of that activity until everyone's licensed and that's specifically what is contemplated by the Video Gaming Act. You cannot, pursuant to this contract, install a single video gaming terminal or generate a single penny of revenue without both parties being licensed and without it being a use agreement. I think I asked a late question and I think you've answered it. Thank you. Councilor Sumerbottom Yes, Governor. I think what we can see here is that Jim wants to have his cake and eat it too. Clearly Jim has made the argument that the Illinois Video Gaming Act does not apply nor do its regulations. However, what we've just heard is a discussion of how this is going to, you know, these precursor agreements are going to, if they're determined to be illegal, is going to be a problem for the Illinois Gaming Board and a problem under the Illinois Video Gaming Act. Well, the Illinois Video Gaming Act, if we accept Jim's position, which we do believe is correct, that the act does not apply because these aren't use agreements, we have to have something to regulate it, which is the only law that applies, which is the criminal code. When you have gambling and a contractor gambling, it is void of an issue because it's illegal. I would like to go back to what the criminal code says. It says gambling is when any person bargains for the sale or release of a video gaming device. It's not that they actually are accepting video gaming devices into their operation, it's they have a contract that is a bargain for that video gaming, the sale or release of that video gaming device. Here, the agreement at issue is a bargain for the lease of a video gaming terminal for placement at some point in time into an establishment. The criminal code is not temporal. The bargain is what is considered to be the gambling. It's a contract for gambling. Clearly the Illinois criminal code applies. Clearly, pursuant to Jim's own argument, the Illinois Video Gaming Act does not apply, and therefore this court should find the agreement to be void of an issue. As to the triple seven contract and agreement that is a subject of the triple seven versus Jim case, the lease would take the position that, Jim is correct, that agreement is absolutely void of an issue as well. And I think that, Justice, you actually stated that they could have another agreement that's been entered into when they were both licensed entities, and obviously that agreement would be, in fact, enforceable and valid because you have two licensed entities governed by the Illinois Video Gaming Act and the regulations as well as the IGB being able to enforce those regulations. So, just to reiterate, Jim cannot try to have his cake and eat it too. He cannot try to say that these precursor agreements should somehow be okay because the Illinois Video Gaming Board says in their application process that it's okay, when they're at the same time saying hey, the Illinois Video Gaming Act does not apply at all. Neither does its regulations. It's not within the purview of the IGB to even make a decision whether this precursor agreement is valid or not. The only thing that makes it invalid and void of an issue is the criminal code which says it's a contract for gambling which is illegal. Thank you. Thank you. Counsel, thank you both here today for your arguments. We'll take the matter under advisement. A written disposition will be issued right now. The court will be in recess until 1.15.